IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12CV405

| | |
|---|---|
| CRAIG PERRY, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| Vs. ) | ORDER |
| ) | |
| MAIL CONTRACTORS OF AMERICA, ) | |
| INC., ) | |
| ) | |
| Defendant. ) | |
| _____) | |

This matter is before the Court upon Defendant's Motion for Summary Judgment. Plaintiff, a former employee of Defendant, filed this Title VII action alleging race discrimination in his termination. This motion is fully briefed and ripe for decision.

**Factual Background**

Plaintiff, an African-American truck driver, was terminated from his job with Defendant after being involved in a traffic accident in which he rear-ended another vehicle on an interstate. Plaintiff has sued alleging that white drivers who also had accidents were not terminated and thus his termination was the result of racial discrimination.

Defendant Mail Contractors of America, Inc. ("MCA") is a ground transportation contractor providing transportation services throughout the United States. MCA provides regional, short haul, local, and intermodal transportation services to clients, including acting as a contractor of various transportation services to the United States Postal Service ("USPS"). As a transportation company, MCA employs numerous professional commercial Truck Drivers throughout the United States, many of whom drive MCA's fleet of tractor trailers, commonly referred to as "eighteen

1

wheelers." To facilitate its network of transportation services, MCA operates regional Terminals in various locations. One such regional Terminal is located in Greensboro, North Carolina.

Within a Terminal's region, MCA's professional commercial drivers report either to the Terminal facility or to various other locations – called Domiciles – to work. A driver who reported to a Domicile would report to his Domicile location, pick up an MCA truck and loaded trailer, and begin his assigned route. Normally, after delivering the load, the Truck Driver will then return to his or her Domicile. Drivers assigned to Domiciles may thus rarely if ever physically report to a regional Terminal, and Terminal Managers may often not meet Truck Drivers who report to a domicile in person.

The safety of its drivers and the public is of paramount concern to MCA. To ensure that its drivers and the public are safe, MCA's professional commercial drivers are held to a higher standard of care in operating these tractor trailers than the ordinary, non-professional lay driver. MCA instituted safety-related policies and practices in order to ensure its Truck Drivers met or exceeded this high standard of safety. One of MCA's most important expectations is for professional commercial drivers to constantly evaluate their speed, the speed limit, the road conditions, the weather conditions, visibility, traffic flow, traffic pattern, traffic volume, other surrounding drivers, and any other relevant factor and adjust the speed of their tractor trailer accordingly. In other words, a professional Truck Driver at MCA is expected to practice the highest levels of defensive driving possible.

MCA considers some types of accidents more serious than others. For example, if an MCA Truck Driver drives a tractor trailer at unreasonable speeds – again depending on the road conditions, traffic pattern, traffic volume, weather, etc. – and as a result of that unreasonable speed the driver loses control of the tractor trailer and the vehicle rolls over, MCA considers such a "roll-over" accident in the most serious category of accidents. Similarly, if an MCA Truck Driver fails to adequately evaluate their speed, visibility, road conditions, weather, traffic pattern, traffic volume,

2

etc. and the driver's truck strikes a vehicle from behind, the accident is considered more serious. Drivers who fail to adequately observe their surroundings and manage their vehicle's speed and who cause or fail to avoid an accident as a result are deemed by MCA as driving "too fast for conditions."

When an MCA Truck Driver is involved in a traffic accident, he or she must report the accident to MCA if the accident is a "company reportable accident." A "company reportable accident" is defined in MCA's Employee Reportable Vehicle Accident Policy as "any event whereby any Company vehicle … comes in contact with anything other than the normal driven portion of the roadway," and which results in, among other things, any vehicle damage, monetary loss, and/or equipment and/or driver downtime.

Once an accident is reported, MCA investigates the nature and circumstances surrounding the accident. The Home Office Safety Department's representative will take the driver's oral and written statement as well as compile any other documentation that may be relevant, including police reports, traffic citations, witness statements, estimates of damages, etc., and compile an accident file. The accident file is then reviewed by an Accident Review Committee, normally comprised of the Truck Driver's Terminal Manager, the Safety Director, and the Safety Administrator. A representative of Human Resources would also normally participate on the Accident Review Committee as a non-voting participant. The Accident Review Committee reviews each accident file on a case-by-case basis. Normally, the Accident Review Committee will review the transcribed verbal statement of the Truck Driver, the Preliminary Accident Report completed by the Truck Driver, any traffic citations (if any), any other witness statements, and any other factors relevant to the specific traffic accident being reviewed.

From these accident file documents, the Accident Review Committee analyzes the facts and circumstances surrounding an accident, such as the speed the driver was going, the conditions of the road, the traffic flow, pattern, and volume, the Truck Driver's knowledge of the road or route, the actions the Truck Driver took to avoid the accident, traffic citations issued to the Truck Driver, etc.

After reviewing and analyzing the information and documentation in the accident file, the members of the Accident Review Committee will determine whether, in their judgment, the Truck Driver took the necessary defensive driving actions to prevent the accident from occurring. If the Accident Review Committee deems the accident "Preventable," then its members will make a secondary determination, again using their judgment based on the facts presented in the accident file, whether the Truck Drivers' actions in causing or failing to avoid an accident amount to recklessness.

If the Accident Review Committee determines that a traffic accident was "Preventable," but that the truck driver's actions did not rise to the level of "Reckless," then the Truck Driver will normally be issued a two day suspension without pay or a final written warning letter in lieu of suspension and be placed on "Critical Notice" for two years. If an employee on Critical Notice due to a Preventable traffic accident has a *second* Preventable accident within that two year Critical Notice period, then the Truck Driver's employment will normally be terminated. If, however, the Accident Review Committee determines that a traffic accident was "Preventable," and that the Truck Driver's actions in causing or failing to avoid the accident rose to the level of "Reckless," then it is recommended that the Truck Driver's employment be immediately terminated irrespective of the Truck Driver's accident history or Critical Notice period(s).

If the Accident Review Committee determines an accident is preventable and reckless, then the Accident Review file is sent to the Conduct Committee (normally comprised of a representative of Human Resources and legal counsel) for a second-level review. If the Conduct Committee agrees that the accident was reckless, then a termination letter is generated and signed by the employee's terminal manager.

After being notified of termination, an MCA Truck Driver may appeal that decision. Truck Driver termination appeals are reviewed by the Accident Re-Determination Committee, normally comprised of a neutral Terminal Manager, and two of the Truck Drivers peers: meaning non-

management Truck Drivers from other Terminals or Domiciles. The Accident Re-Determination Committee's decision is then binding on the Company.

Plaintiff was hired by MCA in June of 2007 as a Truck Driver and was assigned to drive a tractor trailer transporting USPS mail. Plaintiff's Terminal Manager was John Donnelly.[1] At the time, Plaintiff lived in Blythewood, South Carolina, and reported to work at the MCA Domicile located in Columbia, South Carolina, within the Greensboro Terminal's region. At the time of Plaintiff's termination he was assigned to a "shuttle route" – meaning a route out-and-back in one day – transporting USPS mail from Columbia, South Carolina to the Terminal in Greensboro, North Carolina, and then back to Columbia again.

On November 28, 2011, while Plaintiff was driving an MCA tractor trailer from the Greensboro Terminal to the Columbia Domicile as part of his normal Greensboro shuttle route, Plaintiff was involved in a traffic accident. At approximately 2:45 a.m., Plaintiff was travelling south on Interstate 77 near Blythewood, South Carolina. There was a light mist falling at the time. As Plaintiff approached the exit/entrance ramps at Blythewood, South Carolina, Plaintiff was driving in the far left lane. Plaintiff knew that at the Blythewood exit, the entrance ramp on to Interstate 77 creates a third, far right lane. Plaintiff also knew that beginning in Blythewood, tractor trailers were prohibited in the far left lane of Interstate 77. Plaintiff therefore merged into the middle lane. Plaintiff was going approximately 60 miles per hour as he merged into the middle lane and approached the Blythewood exit. When Plaintiff moved to the middle lane, a car that was behind Plaintiff in the far left accelerated and drew up next to Plaintiff in the left lane. At that point, Plaintiff could see a vehicle approximately a quarter of a mile directly in front of him. At the same time, a car was entering the Interstate from the right, and the car accelerated until it was next to

---

[1] Plaintiff admitted during deposition that he had never met Mr. Donnelly or spoken with him in person prior to his November 28, 2011 traffic accident. Mr. Donnelly did not know Plaintiff's race until receiving the EEOC Charge of Discrimination filed by the Plaintiff.

Plaintiff in the right lane. Consequently, as Plaintiff rapidly approached the vehicle in front of him, Plaintiff was in the middle lane with a car in the immediate left and right lanes.

Plaintiff then realized that the vehicle in the middle lane directly in front of him was an extremely slow-moving bus. Plaintiff estimated that the bus was travelling approximately 30 to 40 miles per hour. Plaintiff could not merge left or right due to the cars in the left and right lanes; instead, Plaintiff slammed on his brakes in an attempt to avoid hitting the bus. Unfortunately, due to his speed, Plaintiff was unable to slow down enough and Plaintiff's tractor trailer struck the bus from behind. Both the front end of the tractor trailer driven by Plaintiff and the rear end of the bus which Plaintiff struck were significantly damaged, however, there were no injuries. An officer from the South Carolina Highway Patrol arrived and prepared an accident report. Plaintiff was issued a traffic citation for driving "too fast for conditions" by the South Carolina Highway Patrol.

As part of MCA's investigation into Plaintiff's accident, Plaintiff was interviewed by Accident Investigation Assistant Lynda Terry, who tape-recorded and prepared a written summary of Plaintiff's verbal statement. During Ms. Terry's interview of Plaintiff, Plaintiff admitted that he was travelling approximately 60 miles per hour at the time of the accident. Plaintiff admitted he knew the approaching Blythewood intersection would require him to move into the center lane from the left lane (which prohibited trucks at that point), and also that exit and entrance ramps a highway merged into and out of the Interstate.

The Accident Review Committee assigned to review Plaintiff's accident was comprised of Mr. Donnelly, Ms. Terry, Safety Director Bruce Wrinkle, and non-voting Human Resources representative Christina Thornton. The Accident Review Committee reviewed Plaintiff's statement, the accident report, and Plaintiff's traffic citation for driving too fast for conditions, and determined that Plaintiff's traffic accident was preventable. The Accident Review Committee further determined that Plaintiff's driving rose to the level of recklessness because he was driving too fast for conditions, failed to maintain a proper lookout, was inattentive to traffic in front and around him, failed to

recognize traffic hazards, was following too close, and did not brake the vehicle until the last minute. The Accident Review Committee also noted that Plaintiff was familiar with the area, had driven this route for a period of time, and should have been aware of this traffic pattern, conditions, etc., and reduced his speed accordingly.

After the Accident Review Committee made this initial determination, Mr. Donnelly sent the request for termination to Defendant's Conduct Committee to perform a second level review of the facts to determine whether they constituted recklessness. The Conduct Committee, comprised of Tina Scott and Sheila McDonald, reviewed the Accident Review Committee's documentation and, on December 9, 2011, agreed that Plaintiff's accident rose to the level of recklessness. In light of the Conduct Committee's recklessness determination, termination of Plaintiff's employment was approved and on or about December 19, 2011, a termination letter was generated, signed by Mr. Donnelly, and mailed to Plaintiff.

On or about December 19, 2011, Plaintiff submitted a formal, handwritten appeal of MCA's decision to terminate his employment. Pursuant to MCA's policy, Plaintiff's appeal was reviewed by the Accident Re-Determination Committee comprised of a neutral Terminal Manager and two of Plaintiff's Truck Driver peers. The Accident Re-Determination Committee upheld the Accident Review Committee's determination that Plaintiff's November 2011 accident was both preventable and reckless. As a result, Plaintiff's termination was upheld.

On or about January 20, 2012, Plaintiff filed a Charge of Discrimination ("Charge") with the EEOC, alleging race discharge in violation of Title VII. In his Charge, Plaintiff alleges that he was treated differently than an unidentified white employee. Plaintiff's Charge was dismissed by the EEOC on April 3, 2012, and Plaintiff then filed suit on June 29, 2012.

## Discussion

Summary judgment is appropriate when the moving party establishes that "there is no genuine dispute as to any material fact and the [moving party] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). While all facts and the reasonable inferences therefrom must be construed in the light most favorable to the non-moving party, that party only creates a "genuine" issue of fact when he produces evidence that would create a reasonable *probability*, and not a mere *possibility*, of a jury finding in his favor. *Cook v. CSX Transp. Corp.*, 988 F.2d 507, 512 (4th Cir. 1993). Rule 56 requires entry of summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). The non-moving party must put forth more than a "mere scintilla" of evidence; "there must be enough of a showing that the jury could reasonably find for that party." *Walker v. Darby*, 911 F.2d 1573, 1577 (11th Cir. 1990) (citation omitted).

Where, as here, the Plaintiff lacks direct evidence of race discrimination, he must proceed under the familiar burden-shifting framework articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The essence of Plaintiff's claim is that MCA's disciplinary decision to terminate him while retaining numerous white truck drivers who were involved in "company reportable accidents" of equal or greater severity was racially discriminatory. Accordingly, in order to establish a *prima facie* case of discrimination, Plaintiff must show: (1) that he is a member of a protected class; (2) that the prohibited conduct in which he engaged was comparable in seriousness to the misconduct of employees outside the protected class; and (3) that the disciplinary measures enforced against him were more severe than those enforced against those other employees. *See Cook*, 988 F.2d at 511.

When a plaintiff "base[s] their allegations completely upon a comparison to an employee from a non-protected class … the validity of their prima facie case depends upon whether that

comparator is indeed similarly situated." *Haywood v. Locke*, 387 F. App'x 355, 359 (4th Cir. 2010) (citing *Tex. Dep't of Comty. Affairs v. Burdine*, 450 U.S. 248, 258 (1981)). As a result, a successful plaintiff must show he is "similar in all relevant respects to their comparator." *Id.* (internal citations omitted). To show that the comparator is similar in all relevant respects, a plaintiff must put forth evidence that the employees "dealt with the same supervisor, [were] subject to the same standards and ... engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id*. (quotations and citation omitted). *See also Radue v. Kimberly-Clark Corp.*, 219 F. 3d 612, 617-18 (7th Cir. 2000) (to be a similarly situated comparator, the employee normally must share the same supervisor as plaintiff.)

Not only must the plaintiff demonstrate the comparator was supervised by the same manager, but he must also show that the same decisionmaker "consciously overlooked" misconduct by others outside the protected class "when he disciplined [plaintiff] more severely." *Duggan v. Sisters of Charity Providence Hospitals*, 663 F. Supp. 2d 456, 463 (D.S.C. 2009) (quoting *Moreland v. Miami-Dade County*, 255 F. Supp. 2d 1304, 1313 (S.D. Fla. 2002) (internal quotation omitted)). "The mere fact that a decisionmaker held a position in the plaintiff's chain of command 'is not evidence that he personally knew of each comparators' misconduct or the discipline each supervisor imposed.'" *Id.* (citing *Moreland*, 255 F. Supp. 2d at 1313, n.5). In fact, unless the plaintiff can prove the decisionmaker "'knew of the [comparators' misconduct] the events cannot be considered in determining whether [plaintiff and his comparators] are similarly situated.'" *Id.* (quoting *Knight v. Baptist Hosp. of Miami, Inc.*, 330 F.3d 1313, 1317 n.5 (11th Cir. 2003); *Anderson v. WBMG-42*, 253 F.3d 561, 567 n.3 (11th Cir. 2001) (comparator's misconduct irrelevant where no evidence existed that middle manager brought misconduct to decisionmaker's attention).

Finally, a plaintiff must show that the relevant comparator worked during the same time period that the alleged discrimination occurred. *Sampson v. City of Cambridge, Md.*, Civil No.

9

WDQ-06-1819, 2008 WL 7514365, at *7 (D. Md. June 5, 2008) (citing *Jordan v. City of Gary*, 396 F.3d 825, 834 (7th Cir. 2005) (comparator must be similarly situated to plaintiff at time of alleged discrimination)), *aff'd sub nom*. *Sampson v. City of Cambridge, Maryland*, 322 F. App'x 295 (4th Cir. 2009); *Williams v. Commonwealth of Virginia, Dep't of Soc. Servs.*, Civ. A. No. 3:93CV688, 1995 WL 848699, at *24 (E.D. Va. Aug. 21, 1995) (comparators must be similarly situated "during the relevant time period."), *aff'd sub nom. Williams v. Com. of Va., Dep't of Soc. Servs.*, 81 F.3d 153 (4th Cir. 1996).

In support of factors two and three, Plaintiff has identified several white MCA drivers that he claims were all involved in one or more "preventable" accidents, but were not subjected to the same disciplinary action as Plaintiff. These drivers are Dennis Dowd, Samuel Dillon, William Tillery,[2] Paul Bydalek and James Doss. However, Plaintiff cannot establish that these drivers are similarly situated comparators because each had accidents during different time periods than Plaintiff's accident, each had a different supervisor than Plaintiff, different members of the Accident Review Committee reviewed each of their accidents, and each had a different and less severe type of traffic accident than Plaintiff. Moreover, the Defendant's Accident Review Committee did not consider any of the comparator's accidents to be "reckless."

Plaintiff next points to the termination of African-American driver Larry Powell as evidence in support of his claim that he was treated differently than white drivers. However, Defendant's undisputed evidence establishes that Mr. Powell is likewise not an appropriate comparator, as he was supervised by a different individual, his accident occurred almost two years prior to the Plaintiff's, and the members of the Accident Review Committee were different than those who reviewed Plaintiff's accident. Moreover, Mr. Powell's accident was factually different than the other white

---

[2] There is no evidence of Mr. Tillery's race. Accordingly, he cannot even be considered as a "white" comparator.

comparators, as it involved driving too fast for conditions and the inappropriate use of a "jake brake."[3]

It appears from the evidence that the closest "comparator" is Wilbur Stevens. Mr. Stevens, like Plaintiff, was terminated after he had an accident that was deemed by MCA to be both "preventable" and "reckless." Mr. Stevens had the same supervisor as Plaintiff, had an accident the same month, and was involved in the same type of accident, a rear-end collision on the interstate, as Plaintiff. Moreover, the same members of the Accident Review Committee reviewed Mr. Stevens' accident and Plaintiff's accident. Both Mr. Stevens and Plaintiff were determined to have been driving "too fast for conditions" when their respective accidents occurred. Both Mr. Stevens and Plaintiff were terminated in December of 2011 for having preventable, reckless accidents. Mr. Stevens is white. Plaintiff attempts to distinguish Mr. Stevens as a proper comparator by stating that he was a part-time driver. However, both part-time and full-time drivers are equally subject to MCA's safety expectations and accident review process. Accordingly, Mr. Stevens' part-time status is simply not relevant to the disparate discipline analysis. Plaintiff also argues that Mr. Stevens' accident was more severe because there were people injured. However, MCA's evidence is that it makes no difference whether an accident results in injury. The only relevant inquiry during the Accident Review Committee analysis is whether the accident was preventable and whether the driver was reckless.

Another fact weighing heavily against Plaintiff is that of the six drivers who were supervised by John Donnelly (Plaintiff's supervisor at the time of his termination) and who have been terminated since August of 2011, Plaintiff is the only African-American. The remaining five are all white. While Defendant does not contend that these drivers are similarly situated comparators, it does cite this fact as indicative that no disparate discipline occurred.

---

[3] A "jake brake" is a type of engine braking mechanism installed on some diesel engines. Jake brakes should not be used in icy conditions, as they can cause a loss of traction and potential jackknifing of a tractor trailer. Mr. Powell's accident occurred in icy and snowy conditions.

Plaintiff simply cannot establish a *prima facie* case for disparate discipline because he cannot demonstrate that similarly situated white drivers were treated differently. In fact, the only truly similarly situated white driver was treated exactly the same as the Plaintiff. Accordingly, Plaintiff fails to raise a genuine issue of material fact as to his claim.

IT IS THEREFORE ORDERED that Defendant's Motion for Summary Judgment is hereby GRANTED.

Signed: November 20, 2012

Graham C. Mullen
United States District Judge